# Illinois Official Reports

## Appellate Court

---

### *People v. Jakes*, 2013 IL App (1st) 113057

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY JAKES, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-3057 |
| Filed | December 11, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The denial of defendant's postconviction petition alleging that two detectives obtained his confession through the use of threats and beatings was reversed and the cause was remanded with directions to allow defendant to seek discovery of evidence supporting his allegations of official misconduct and to amend his petition based on any such evidence he might discover, notwithstanding the State's contention that there were no allegations of police misconduct at the time defendant's motion for discovery was denied, since police misconduct was adequately alleged in the initial petition and the trial court abused its discretion in denying defendant's motion for discovery in relation to his petition. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 92-CR-5073; the Hon. Nicholas Ford and the Hon. Michael Toomin, Judges, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Loevy & Loevy, of Chicago (Tara Thompson, Jon Loevy, Russell Ainsworth, and Debra Loevy-Reyes, of counsel), for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |

| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion.
Presiding Justice Hyman and Justice Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1     This case involves a postconviction petitioner's right to discovery. A jury found Anthony Jakes guilty of murder, based largely on a confession Jakes signed after questioning by Detectives Michael Kill and Kenneth Boudreau. Jakes testified that he signed the statement because Kill beat him and threatened him while Boudreau watched. Kill and Boudreau denied that they beat or threatened Jakes. The jury and the trial court that assessed the credibility of Kill, Boudreau and Jakes never heard evidence that Kill and Boudreau beat and threatened suspects in other cases to obtain signed confessions and that they committed perjury to convince courts and juries to rely on the coerced confessions.

¶ 2     Jakes filed a postconviction petition and he sought discovery concerning the misconduct of Kill and Boudreau in other cases. The circuit court denied the motion for discovery and then held that the evidence Jakes presented without discovery did not sufficiently establish Kill's pattern and practice of beating and threatening suspects to get them to sign confessions. The circuit court dismissed the postconviction petition without holding an evidentiary hearing on the allegations of Kill's and Boudreau's misconduct. We hold that the trial court abused its discretion when it denied Jakes' motion for discovery concerning the misconduct of Kill and Boudreau in other cases. We reverse and remand for further proceedings on the postconviction petition.

¶ 3                 BACKGROUND

¶ 4     On September 15, 1991, a police officer found Rafael Garcia lying in the street, dying from multiple gunshot wounds, next to a car with a broken window on the passenger side. Around 12:30 p.m. the following day, Officer Thomas Pack went to a home near the murder scene

where Jakes, then 15 years old, lived with his aunt, Jessie Mae Jones. After entering the home, Officer Pack permitted Jakes to put on his clothes, and then Pack took Jakes to police headquarters. Kill and Boudreau began interviewing Jakes after 4 p.m. Police also picked up Gus Robinson on September 16, 1991, for questioning about the murder of Garcia. Around 4:30 a.m. on September 17, 1991, Jakes signed a statement an assistant State's Attorney wrote out. Robinson signed a statement around the same time, after eight hours of questioning.

¶ 5    According to the statement Jakes signed, on September 15, 1991, Arnold Day, a friend of Jakes, asked Jakes to watch for police while Day robbed a man he saw in a nearby sandwich shop. As Jakes walked to the corner, he met Robinson. He asked Robinson to help him watch for police. Robinson refused to help and drove off. Jakes told Day he saw no police in the area. When the intended victim left the sandwich shop, Day said to him, "This is a stickup." The man ran to his car and started it. Day then shot the man through the car's passenger window. Jakes ran home. He looked out at the street and saw the man moving on the ground.

¶ 6    Photographs taken on September 18, 1991, one day after Jakes signed the statement, showed that Jakes had several fresh bruises. A doctor examined Jakes in custody on September 20, 1991.

¶ 7    Robinson signed a statement that said that on September 15, 1991, Jakes, who knew Robinson from the neighborhood, asked Robinson to help watch for police while Day robbed a man. Robinson refused to help. As he drove away, he heard some gunshots.

¶ 8    Prosecutors charged Jakes with murder and attempted robbery. Jakes moved to quash his arrest and suppress the statement he signed. At the hearing on the suppression motion, the State admitted that police had no warrant when they picked up Jakes from his home. Jakes testified that when police came to his home on September 16, 1991, they slammed him against a wall and handcuffed him. At the police station, one of the officers put his hands in Jakes' pocket then showed Jakes a tinfoil packet that the officer said held cocaine. Jakes did not know where the tinfoil packet came from. Kill accused Jakes of shooting Garcia. When Jakes said he knew nothing about it, Kill slapped him and threatened to push him out a window. Kill said some Latin Kings would attack Jakes' family, if Kill asked them to do so. Kill knocked Jakes on the floor and kicked him while Boudreau watched. Jakes identified the photographs taken on September 18, 1991, and he testified that the photographs showed the injuries Kill inflicted on Jakes' arm, leg, side, stomach and back. Jakes eventually signed the statement the assistant State's Attorney wrote out. Jakes admitted that he did not tell the doctor at the jail, the police, or the assistant State's Attorney how he sustained the injuries. Because of Kill's beating and threats, Jakes signed the statement that said police treated him well. Jakes testified that he did not get into any physical fight on September 15 or 16 before he came to the police station, and he never said to any officer that such a fight had occurred.

¶ 9    Jakes' aunt, Jones, testified that police entered her home without her permission and brought Jakes out of his bedroom in handcuffs. Pack testified that Jones permitted him and other officers to enter and go to Jakes' bedroom. According to Pack, police did not handcuff Jakes in his home. Jakes agreed to come to the police station for questioning. Pack found the tinfoil packet of cocaine in the pocket of the pants Jakes chose to put on when police picked him up for questioning. Pack arrested Jakes at the police station after finding the drugs.

¶ 10    Kill testified that he never struck or threatened Jakes, and Jakes volunteered information about the murder and his contact with Robinson. Boudreau testified that Jakes told him that three black men fought with him on September 16, 1991. The prosecution argued that the fight, and not police brutality, explained Jakes' bruises.

¶ 11    The trial court found the testimony of the officers more credible than the testimony of Jakes and Jones. The court denied the motion to quash the arrest and suppress the statement.

¶ 12    At trial, Robinson testified in accord with the statement he signed. Robinson, who had two prior felony convictions, admitted that prosecutors agreed not to charge him with contempt for failing to show up for a scheduled court date if he testified in accord with the statement an assistant State's Attorney wrote out and Robinson signed.

¶ 13    Police officers testified about their investigation into Garcia's murder. No physical evidence or testimony, apart from Robinson's statement, tied Jakes to the crime. The assistant State's Attorney read into the record the statement Jakes signed. The statement included no verifiable, correct details about the crime that the police did not know before questioning Jakes.

¶ 14    Jakes again testified about the circumstances of his arrest and the beating and threats that caused him to sign the false statement. Kill repeated his testimony that Jakes volunteered the confession, including the encounter with Robinson. Kill swore that he did not coerce or threaten Jakes in any way. Boudreau corroborated Kill's testimony, swearing that he never saw any officer strike or threaten Jakes.

¶ 15    The jury found Jakes guilty of armed robbery and murder. The trial court sentenced Jakes to 40 years in prison for murder and 15 years for attempted armed robbery, with the sentences to run concurrently. The appellate court affirmed the conviction and sentences on direct appeal. *People v. Jakes*, No. 1-93-4471 (1995) (unpublished order under Supreme Court Rule 23).

¶ 16    In 1996, Jakes filed a postconviction petition and the circuit court appointed counsel to represent him in postconviction proceedings. Counsel sought multiple continuances in a quest for evidence to support Jakes' assertion in his postconviction petition that Kill beat him and threatened him to induce him to sign the false statement used as evidence at trial. Due to an ongoing investigation into criminal conduct by several police officers, including Kill and Boudreau, counsel had very limited access to evidence that Kill and Boudreau coerced other suspects to sign confessions and committed perjury to obtain convictions based on the coerced confessions.

¶ 17    In 2004, counsel finally stopped trying to obtain evidence of misconduct by Kill and Boudreau in other cases to support Jakes' postconviction petition. The attorney filed a supplement to Jakes' postconviction petition, adding allegations of ineffective assistance of trial and appellate counsel. The attorney asserted that Jakes' trial counsel had failed to investigate the crime scene adequately. If trial counsel had thoroughly investigated the crime scene, he would have realized that Jakes could not have seen Garcia dying on the street from his window because no window in the home Jakes shared with Jones had a view of the street. According to the supplement to the postconviction petition, the evidence of a false assertion in

the written statement Jakes signed would have supported Jakes' testimony at trial that he signed the false statement because Kill beat and threatened him while Boudreau watched.

¶ 18 The circuit court granted the State's motion to dismiss the postconviction petition and its supplement. The appellate court held that, in this case, with very closely balanced evidence, the petition and its supporting documents substantially showed that Jakes received ineffective assistance of trial counsel for failure to adequately investigate the crime scene and ineffective assistance of appellate counsel for failure to raise ineffective assistance of trial counsel on the direct appeal. *People v. Jakes*, No. 1-04-1388 (2006) (unpublished order under Supreme Court Rule 23). Accordingly, the appellate court reversed the dismissal of the postconviction petition and remanded the case for an evidentiary hearing. *Jakes*, No. 1-04-1388. The appellate court noted that Jakes and his postconviction counsel, through no fault of their own, had not produced evidence from other victims to support his claims of police brutality and perjury. The appellate court said, "since this case is being reversed and remanded, Jakes may amend his petition and address his police brutality claim on remand." *Jakes*, No. 1-04-1388, slip op. at 17-18.

¶ 19 On remand, Jakes filed a motion for discovery of evidence of past misconduct by Kill and Boudreau to impeach their testimony and support Jakes' claim regarding the statement he signed. The circuit court denied the motion for discovery. Instead, the court told counsel that if Jakes wished to pursue his misconduct claims against Kill and Boudreau, he needed to file a supplemental petition based on evidence he could present without discovery.

¶ 20 Counsel filed an amended postconviction petition to further support Jakes' claim, in the original postconviction petition, that Kill threatened him and Kill and Boudreau lied under oath about the way they obtained Jakes' signature on the statement the assistant State's Attorney wrote. Jakes alleged, with supporting documents, that Kill participated in the beating and intimidation of Alnoraindus Burton in 1989; Mark Craighead in 1989; Jason Gray in 1986; Harold Hill in 1992; Ronald Kitchen in 1988; Anthony Robinson in 1988; Johnny Walker in 1988; Phillip Walker in 1987; Demond Weston in 1990; Marcus Wiggins in 1991; Anthony Williams in 1992; and Eric Wilson in 1988. Jakes also alleged that Boudreau participated in the beating and intimidation of Arnold Day in 1992; Fred Ewing in 1993; Derrick Flewellen in 1995; Jerry Gillespie in 1993; Oscar Gomez in 1995; Harold Hill in 1992; Alfonzia Neal in 1991; John Plummer in 1992; Tyrone Reyna in 1993; Clayborn Smith in 1992; Darnell Stokes in 1993; Michael Taylor in 1994; Sean Tyler in 1994; Kilroy Watkins in 1992; Peter Williams in 1992; and Dan Young in 1992. The supporting documents included a few affidavits of the alleged victims, some complaints in lawsuits brought by the alleged victims, some decisions of appellate courts recounting the records in criminal cases brought against other alleged victims of Kill and Boudreau, and some transcripts of testimony in other lawsuits.

¶ 21 The State moved to dismiss all allegations of misconduct committed by Kill and Boudreau. The circuit court first dismissed as irrelevant all allegations of Boudreau's extensive history of misconduct, because Jakes testified only that Boudreau watched while Kill beat him and threatened him. Next, the court struck as too remote in time all allegations of Kill's misconduct before 1988, and all allegations supported by documents other than affidavits of the alleged victims. Even when the alleged victim testified about Kill's crimes, the circuit court refused to

accept the testimony as grounds for an evidentiary hearing on the allegations or for permitting further discovery about the allegations. The circuit court eliminated from its consideration evidence related to all of Kill's and Boudreau's alleged victims other than Burton and Kitchen. The court then held that those two examples could not make enough of a pattern to support Jakes' claim, and therefore the circuit court dismissed all of Jakes' claims related to the misconduct of Kill and Boudreau.

¶ 22     At the hearing on Jakes' claim that his trial counsel provided ineffective assistance, his trial counsel testified that he drove to the crime scene and looked around through his car window, but he felt no need to inspect the scene more closely. He did not try to determine whether Jakes could have seen the street from his home because he did not consider the assertion that Jakes saw Garcia dying on the street a significant part of the statement Jakes signed. The attorney also said that he did not like to call police officers liars, so he did not want to challenge the credibility of Kill and Boudreau.

¶ 23     The circuit court agreed with Jakes' trial counsel that the fact that Jakes could not have seen Garcia from his window constituted only an "inconsequential contradiction" that could not have persuaded the jury that Kill and Boudreau decided what should go into the statement to make it a credible confession, and that Jakes signed the false statement to stop the beatings and threats. The court denied the postconviction petition. Jakes now appeals.

¶ 24                                    ANALYSIS

¶ 25     Because the circuit court dismissed the allegations of police misconduct without holding an evidentiary hearing, we review the dismissal of those allegations *de novo*. *People v. Fair*, 193 Ill. 2d 256, 260 (2000). The circuit court has discretion to order discovery in postconviction proceedings. *Fair*, 193 Ill. 2d at 264. The circuit court should permit discovery if the moving party establishes good cause for the request. *Fair*, 193 Ill. 2d at 264-65. The court should consider "the totality of the relevant circumstances, including the issues presented in the petition, 'the scope of the discovery sought, the length of time between the conviction and the post-conviction proceeding, the burden [of granting discovery,] and the availability of the desired evidence through other sources.' " *People v. Smith*, 352 Ill. App. 3d 1095, 1113 (2004) (quoting *People ex rel. Daley v. Fitzgerald*, 123 Ill. 2d 175, 183-84 (1988)). The appellate court should reverse the circuit court's decision on a request for discovery in a postconviction proceeding only if the trial court abused its discretion. *Fair*, 193 Ill. 2d at 265.

¶ 26     The State argues that the trial court correctly denied the motion for discovery because at the time of the motion, the postconviction petition included no allegations of police misconduct. The State's argument rests on a mistake. The initial postconviction petition, filed years before the discovery motion, included several allegations of police misconduct, and the discovery counsel sought would lend support to those allegations. Counsel's decision not to repeat those allegations in his own submission to the court, labeled a supplement to the postconviction petition, does not remove the allegations from the petition. Before defense counsel requested discovery concerning police misconduct, the postconviction petition adequately alleged police misconduct.

¶ 27    Our supreme court addressed the issue of postconviction discovery in *Fair*, 193 Ill. 2d 256. In *Fair*, Judge Foxgrover presided at Fair's jury trial on a murder charge. The jury found Fair guilty. In a postconviction petition, Fair alleged that Foxgrover's corruption violated Fair's right to a fair trial. Foxgrover had pled guilty to 159 crimes, including theft, official misconduct, obstruction of justice and perjury. Fair sought discovery of evidence the State's Attorney's office gathered in its investigation into Foxgrover's corruption. In particular, Fair requested Foxgrover's confession and the interviews the State's Attorney's office conducted with witnesses to Foxgrover's crimes. The circuit court denied the request for discovery.

¶ 28    Our supreme court acknowledged that Fair's postconviction petition lacked specificity concerning Foxgrover's corruption and its effect on the case against Fair. *Fair*, 193 Ill. 2d at 266. The *Fair* court said:

> "The State argues that petitioner has not established good cause for his discovery request because nothing in the post-conviction petition suggests that a nexus exists [between Foxgrover's crimes and the trial of Fair]. The State's argument, however, puts petitioner in an impossible dilemma. According to the State, petitioner is entitled to seek out evidence that there is a nexus between Judge Foxgrover's criminal conduct and petitioner's trial only if he already possesses such evidence. The State also argues that allowing petitioner to conduct discovery will further delay the adjudication of this case. *** The finality of criminal convictions is a hollow achievement if the integrity of the judicial system which produces these convictions is open to question. Petitioner is entitled to an opportunity to find and present whatever evidence there may be which connects Judge Foxgrover's criminal conduct to his ability to be an impartial judge at petitioner's murder trial." *Fair*, 193 Ill. 2d at 266-67.

¶ 29    Jakes' petition included much more detail about the alleged official misconduct than the petition in *Fair*. Especially because the court found the allegations about most of the other alleged victims of Kill and Boudreau inadequately supported, irrelevant and insufficient to prove a pattern of coerced confessions and perjury, the detail included in the petition does not excuse the decision to deny discovery. The State's Attorney's office here, as in *Fair*, has much better access than the defense to evidence concerning the alleged official misconduct. The evidence of Kill's and Boudreau's misconduct in other cases can alter the relative credibility of Jakes, Jones, Kill and Boudreau in their testimony both at trial and at the hearing on the motion to suppress the statement Jakes signed. See *People v. Mitchell*, 2012 IL App (1st) 100907, ¶¶ 70-72. Following *Fair*, we find that the trial court abused its discretion when it denied Jakes' motion for discovery related to his postconviction petition.

¶ 30    On remand, the circuit court should permit discovery of materials including " 'not only what is admissible at the trial, but also that which leads to what is admissible.' " *People v. Kladis*, 2011 IL 110920, ¶ 26 (quoting *Krupp v. Chicago Transit Authority*, 8 Ill. 2d 37, 41 (1956)). The court should ensure that the parties use discovery to " 'enhance the truth-seeking process, to enable attorneys to better prepare for trial, to eliminate surprise and to promote an expeditious and final determination of controversies in accordance with the substantive rights of the parties.' " *Kladis*, 2011 IL 110920, ¶ 27 (quoting *D.C. v. S.A.*, 178 Ill. 2d 551, 561 (1997)). The court will need to determine whether the materials sought will help lead the

defense to find evidence that " 'tends to prove or disprove something in issue.' " *Kladis*, 2011 IL 110920, ¶ 27 (quoting *Bauter v. Reding*, 68 Ill. App. 3d 171, 175 (1979)).

¶ 31 Because the matters in issue involve alleged beatings and threats by Kill, the court should permit discovery of evidence that affects the credibility of the testimony of Kill and Boudreau about the means by which they persuaded Jakes to sign the statement the assistant State's Attorney wrote. Evidence of other cases in which Kill and Boudreau coerced confessions directly relates to the issues here. Evidence that Kill and Boudreau lied under oath in other proceedings, especially when those proceedings involved statements signed following interrogations by Kill or Boudreau, also should affect the credibility of their testimony here. See *People v. Patterson*, 192 Ill. 2d 93, 145 (2000). The court must permit sufficient discovery to establish a pattern or practice of coerced confessions and perjury, if Kill or Boudreau engaged in such practices. See *Patterson*, 192 Ill. 2d at 140. Kill himself, in a deposition, swore that he obtained confessions in 90% of the murder cases on which he worked, for a total of about 1,500 murder confessions in his career. He added that in 90% of those cases, defense attorneys filed motions to suppress "based on allegations of unnecessary use of physical force."

¶ 32 The State argues that the trial court correctly held evidence that Boudreau beat other suspects and coerced them into signing confessions has no relevance here, because Jakes swore only that Boudreau watched Kill beating Jakes, and Jakes did not say Boudreau hit him. The State ignores the added coercive power that a second police officer brings to an enclosed interview room simply by watching while another officer brutally beats a suspect and verbally threatens to do worse. The officer's silent acceptance of the crime committed by a fellow officer can help persuade their victim that no one associated with police will help him and he will face worse beatings if he tells a police officer, an assistant State's Attorney, or a doctor working for the State about the beatings. Moreover, Boudreau's testimony both at trial and on the motion to suppress puts his credibility in issue, and evidence that he committed perjury in other cases could significantly affect the credibility of his testimony here.

¶ 33 In light of our resolution of the discovery issue, we elect to wait to address the issue of whether the evidence presented at the evidentiary hearing requires reversal and remand for a new trial. We remand for discovery and a new evidentiary hearing.

¶ 34 CONCLUSION

¶ 35 Jakes' initial postconviction petition included allegations that Detectives Kill and Boudreau used beatings and threats to persuade Jakes to sign a false confession and then lied under oath about the beatings and threats. The allegations of official misconduct merited discovery of any evidence in the State's possession that could support Jakes' allegations. Jakes may amend his postconviction petition in light of the discovery of evidence of other misconduct by Kill and Boudreau. The State may respond to the amended petition. The evidence provided in discovery may require a new evidentiary hearing, at which Jakes could present evidence that Kill and Boudreau have beaten suspects, coerced confessions, and provided perjured testimony in other cases. This court will review the trial court's findings after the trial court has held an appropriate evidentiary hearing, for which defense counsel has

- 8 -

access to evidence bearing on the credibility of the testimony of Kill and Boudreau. Accordingly, we reverse the trial court's judgment and remand for further proceedings on the postconviction petition.

¶ 36        Reversed and remanded.