NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 170643-U

NO. 4-17-0643

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 3, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| JOSEPH T. HORTON, | ) | No. 04CF186 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Heidi N. Ladd, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The trial court properly granted the State's motion to dismiss defendant's successive postconviction petition where defendant's newly discovered evidence was not material and lacked conclusiveness and (2) defendant received reasonable assistance of postconviction counsel.

¶ 2     In August 2004, a jury convicted defendant, Joseph T. Horton, of first degree murder (720 ILCS 5/9-1(a) (West 2002)), and the trial court later sentenced him to natural life in prison. In July 2016, defendant, represented by counsel, filed his first motion for leave to file a successive postconviction petition, asserting actual innocence based on newly discovered deoxyribonucleic acid (DNA) evidence. In August 2016, the trial court granted defendant leave to file his successive postconviction petition. Thereafter, the State filed a motion to dismiss defendant's successive postconviction petition, which the court granted on June 29, 2017. The

court later denied defendant's motion to reconsider the dismissal of his successive postconviction petition.

¶ 3        Defendant appeals, arguing (1) the trial court erred by dismissing his successive postconviction petition and (2) he was denied reasonable assistance of postconviction counsel. We affirm.

¶ 4                          I. BACKGROUND

¶ 5                          A. Jury Trial

¶ 6        At defendant's jury trial, the evidence showed the following. On January 29, 2004, at approximately 11:57 a.m., a Champaign police officer responded to a dispatch and found Amy Smith's body lying in a pool of blood in her basement apartment at 1003 North Randolph Street in Champaign. An autopsy performed by Dr. Brian Mitchell showed Smith had suffered 38 clusters of injuries due to blunt force trauma, and 15 stabbing injuries.

¶ 7        Michael Brown testified he and Smith had been friends for approximately two years and he saw Smith daily. He last saw Smith on January 28, 2004, for approximately four hours. During that time Smith received two telephone calls, the first at approximately 10 p.m., and the second shortly after the first. Brown left Smith's apartment at approximately 11:15 p.m. Brown and Smith planned Brown would meet Smith at her place of employment the following morning. Brown often met Smith and her coworkers for coffee.

¶ 8        On the morning of January 29, 2004, Brown drove to Smith's place of employment. Smith was not there. Brown and a coworker of Smith's telephoned Smith but she did not answer. The two became concerned for Smith and Brown drove to Smith's apartment. Brown observed Smith's car parked near her apartment door and approached Smith's apartment. Brown saw blood in the area of the doorway. Brown pushed the door open and saw more blood.

He called Smith's name but there was no answer. Brown returned to his car and drove to the Champaign Police Department.

¶ 9          Brown identified defendant as an individual he had seen on approximately three occasions, while with Smith.

¶ 10          Leigh Ann Borkowski testified she dated defendant for approximately six months. She and defendant went to two bars on the evening of January 28, 2004. Defendant became angry. Borkowski and defendant returned to her condominium where Borkowski ended her relationship with defendant. Defendant left the condominium shortly after midnight. At approximately 7 p.m., on January 29, 2004, defendant telephoned Borkowski telling her the police found a body and thought he had something to do with it.

¶ 11          Borkowski identified various articles of clothing and a pair of work boots defendant wore on January 28, 2004, now blood-stained and found by police officers in multiple dumpsters following Smith's murder.

¶ 12          Edward Chin testified he lived in a second story apartment at 1003 North Randolph Street in Champaign. He was awakened at approximately 3 a.m. on January 29, 2004, by a black male pounding on Smith's door. He heard Smith's voice and observed the individual walk away from the house. At approximately 4 a.m., Chin heard two thumping sounds and later, an individual gasping for air. Chin left his apartment at approximately 5:30 a.m.

¶ 13          Danielle Miller testified she lived in the first-floor apartment at 1003 North Randolph Street in Champaign, with Margaret Ruch. Miller heard an individual pounding on Smith's door at approximately 2:30 a.m. on January 29, 2004, and again at approximately 3 a.m. She observed a black male with very large, muscular hands. He wore dark pants and a dark hooded jacket. Miller listened at a vent in her living room that led to Smith's basement

apartment. She heard Smith yelling at the individual to "get out." Later, Miller and Ruch heard a loud crashing sound coming from Smith's apartment. Miller again listened at the vent and could hear only a low muffled voice uttering what sounded like "unnh" over and over again. Ruch telephoned Smith's apartment at approximately 5 a.m. and Miller could hear the telephone ringing through the vent. Smith did not answer. Miller next heard an individual moving swiftly up the basement stairs and leaving through Smith's apartment door. Miller climbed on her kitchen counter and looked out a window. She saw a black male yelling and gesturing toward the house as he walked away. She recognized the individual as someone she had seen at Smith's door approximately two weeks earlier.

¶ 14        Pearlie Mae Williams testified defendant came to her home on January 29, 2004, at approximately 5:30 a.m. Williams lived with defendant's brother, Dwayne Williams. Defendant became ill while in the home. He took Williams's trash bag and a pair of athletic shoes when he left the home at approximately noon. Police officers found defendant's blood-stained boots in a dumpster behind Williams's home.

¶ 15        James Powell testified he was a friend of defendant. Defendant came to Powell's home on January 29, 2004, at approximately 3 p.m. Defendant asked Powell if he could come in and warm himself. Defendant wore a thin jacket and asked if he could have a coat. Powell did not have an extra coat. Defendant left Powell's home at approximately 3:40 p.m. to catch a bus. Defendant returned shortly stating he missed the bus. Defendant left Powell's home on two more occasions but returned each time stating he missed the bus. Powell did not let defendant back into his home after he left for the bus at approximately 5:40 p.m. because Powell had to rest before work.

¶ 16    Larry McGowan testified he was a friend of defendant. Defendant came to McGowan's home on January 29, 2004, at approximately 5:45 p.m. Defendant asked McGowan for a ride to his sister's home. Defendant wore a thin coat and asked if he could have a coat but McGowan did not have an extra coat. While McGowan was out of the car, defendant got rid of his coat. Police officers later found the blood-stained coat in a nearby dumpster.

¶ 17    Dr. Brian Mitchell, a forensic pathologist, testified he conducted the autopsy of Smith. In addition to 38 clusters of injuries due to blunt force trauma and 15 stabbing injuries, Smith had internal injuries including a collapsed lung and significant trauma to the brain. Dr. Mitchell stated a pattern abrasion on Smith's scalp was consistent with the treads of defendant's boots. Dr. Mitchell also testified, as to the 15 stab wounds, there was not much evidence of hemorrhage to suggest Smith's heart was pumping at the time she received those wounds. He described the wounds as received "perimortem, or even possibly after [Smith] passed."

¶ 18    Dr. Mitchell testified he observed multiple injuries during his examination of Smith, including abrasions to the left elbow, left inner forearm, outer left forearm, a "watch band abrasion" which Dr. Mitchell opined would be consistent with the hand raised, injuries to the back of the right hand, right wrist and forearm abrasions, a laceration to the right index finger and abrasions to the right palm, right elbow, and right forearm. Dr. Mitchell stated many of the abrasions were consistent with "defensive injuries," which he defined as wounds to the forearms and backs of the hands "that would be consistent with someone trying to ward off an attack from either a blunt object, or to protect themselves from a sharp object."

¶ 19    Dr. Mitchell acknowledged a victim in a physical altercation may attempt to scratch or injure her attacker, but Smith suffered "defensive injuries" to her forearms and the backs of her hands. According to Dr. Mitchell, Smith's injuries were indicative of her attempt to

shield her body from the objects used in her murder. Dr. Mitchell also testified there was no evidence Smith had been sexually assaulted. He administered the sexual assault kit, gathering samples of Smith's hair, fingernail scrapings, and blood, because it was a "standard kit for this type of incident." The fingernail scrapings were not DNA tested at the time of trial.

¶ 20 Jennifer Aper, an Illinois State Police forensic scientist, testified she conducted DNA analysis of blood samples from defendant and Smith and the bloodstains found on defendant's boots, left sock, and coat. Aper opined the DNA test results indicated the blood on defendant's boots, left sock, and coat matched Smith's DNA profile.

¶ 21 Detective Mark Strzesak testified he interviewed Joseph Horton on January 29, 2004, at approximately 8:23 p.m. Defendant first told Strzesak he knew Smith but had not seen or spoken to Smith for "a couple of weeks." Later, defendant told Strzesak he may have telephoned Smith that morning.

¶ 22 Strzesak testified defendant wore blue jeans, a grey sweatshirt, an off-white jacket, a pair of athletic shoes, and a black knit stocking cap when arrested. Defendant told Strzesak he had worn the clothes "all of last night."

¶ 23 Defendant testified on his own behalf, admitting he lied during his interview with Strzesak. He had been at Smith's apartment on January 29, 2004, and wore different clothing than when arrested. He telephoned Smith from a friend's on January 29, 2004, at approximately 4:21 a.m., and asked Smith if he could "crash." Defendant walked approximately five minutes to Smith's apartment. He arrived at Smith's apartment at approximately 4:45 a.m. and found Smith's apartment door open. He walked down the stairs and found Smith lying on the floor in a pool of blood. Defendant held Smith's head in his hand and Smith whispered what defendant believed was "Manuel." He placed Smith's head back on the floor and found his hands full of

blood. Defendant shook his hands, wiped them on his pants, and ran from the apartment. Defendant did not call police because he had blood on himself and he was on parole.

¶ 24      David Carter testified on rebuttal he is a crime-scene investigator field supervisor with the Illinois State Police and has specialized in bloodstain pattern analysis. Carter examined the boots worn by defendant on January 29, 2004, finding the bloodstain patterns on the boots consistent with "impact spatter." Carter testified impact spatter is a bloodstain pattern caused when static blood is impacted or moved under force. Further, Carter examined 12 crime scene photographs. The State posed two hypothetical questions to Carter concerning "blood flight" and Carter identified evidence of blood flight in the photographs.

¶ 25      Based on the evidence presented, the jury convicted defendant of first degree murder and the trial court sentenced him to natural life in prison. Defendant filed a direct appeal, arguing (1) his due process rights were violated when the State failed to correct a false impression that no witness could identify defendant; (2) alternatively, he was denied his right to effective assistance of counsel; (3) the court abused its discretion by allowing certain rebuttal testimony; (4) his shackling without a hearing constituted plain error; (5) the court erred when it allowed photographs from the crime scene and autopsy into the jury room during deliberations; (6) the State failed to prove him guilty beyond a reasonable doubt; and (7) the State failed to prove the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, or the court abused its discretion by imposing a natural life sentence. This court affirmed the lower court's judgment. *People v. Horton*, 371 Ill. App. 3d 1224 (2007) (table) (unpublished order under Supreme Court Rule 23).

¶ 26                    B. Postconviction Petition

¶ 27        On November 2, 2007, defendant filed a *pro se* postconviction petition arguing

trial counsel was prejudiced against him and provided ineffective assistance of counsel. On June

27, 2008, defendant, with assistance of counsel, filed an amended postconviction petition adding

additional claims of ineffective assistance of trial counsel and due process violations. On

September 3, 2008, after a hearing on the State's motion to dismiss, the trial court dismissed

defendant's postconviction petition for failure to make a substantial showing of a constitutional

violation. This court affirmed the trial court's judgment. *People v. Horton*, 396 Ill. App. 3d 1141

(2010) (table) (unpublished order under Supreme Court Rule 23).

¶ 28                              C. Section 2-1401 Petition

¶ 29        On August 19, 2010, defendant filed a petition for relief from judgment pursuant

to section 2-1401 of the Code of Civil Procedure (Civil Procedure Code) (735 ILCS 5/2-1401

(West 2008)). In November 2010, the State filed a motion to dismiss, and the trial court

dismissed defendant's petition on January 12, 2011. Defendant appealed and the Office of the

State Appellate Defender (OSAD) moved to withdraw as appellate counsel, arguing the appeal

presented no meritorious issues. This court agreed with OSAD and affirmed the trial court's

dismissal of defendant's petition for relief from judgment. *People v. Horton*, 2012 IL App (4th)

110086-U.

¶ 30                              D. Motion for Forensic Testing

¶ 31        On April 2, 2012, defendant filed a petition for postconviction forensic testing

pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (Criminal Procedure Code)

(725 ILCS 5/116-3 (West 2010)). Defendant requested DNA testing of multiple items of

evidence, including Smith's fingernail scrapings. On May 16, 2013, the trial court entered an

agreed order for forensic testing.

¶ 32                         E. First Successive Postconviction Petition

¶ 33            On July 15, 2016, defendant, through counsel, filed a motion for leave to file a first successive postconviction petition, in which he alleged actual innocence based on new DNA evidence. In his successive petition, defendant outlined the new DNA evidence that he alleged supported his position. Defendant attached to his petition an official report of Cellmark Forensics stating, in relevant part, in a "partial Y-STR profile," defendant was excluded as a contributor of the male DNA obtained from Smith's left-hand fingernail scrapings. (No Y-STR profile was obtained from the right-hand fingernail scrapings.) Defendant also attached to his petition the following three "scholarly exhibits": (1) an article prepared by the Israeli National Center of Forensic Medicine titled, "Evaluating the prevalence of DNA mixtures found in fingernail samples from victims and suspects in homicide cases"; (2) an article prepared by the Centre of Forensic Sciences, Biology Section, Toronto, Ontario, Canada, and titled, "Prevalence and persistence of foreign DNA beneath fingernails"; and (3) an article prepared by two universities and a forensic science laboratory, each located in Scotland, and titled, "The prevalence of mixed DNA profiles on fingernail swabs."

¶ 34            Defendant also filed a petition for relief from judgment under section 2-1401 of the Civil Procedure Code (735 ILCS 5/2-1401 (West 2014)), making substantially the same arguments and with the same attachments as in his successive postconviction petition.

¶ 35            On August 2, 2016, the trial court entered an order allowing defendant's motion for leave to file his first successive petition for postconviction relief and advanced defendant's petition to the second stage of postconviction proceedings. On December 1, 2016, the State filed a motion to dismiss defendant's successive petition, alleging in relevant part, the evidence was not (1) material or (2) of such a conclusive character it would probably change the result on

retrial. The State argued defendant failed to show the significance of the DNA evidence, "aside from pure speculation that it might have come from the person who murdered Amy Smith."

¶ 36        On June 9, 2017, postconviction counsel filed an amended certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013).

¶ 37        On June 29, 2017, the trial court entered a 17-page memorandum of opinion and order granting the State's motion to dismiss defendant's successive postconviction petition and denying defendant's second section 2-1401 petition. The court first found defendant failed to establish how Smith's left-hand fingernail scrapings were material to his case. The court noted "no evidence that [Smith] had any opportunity to scratch her attacker with her hands" and no evidence Smith's left-hand "fingers or fingernails had any sign of offensive injuries or any defects that would be consistent with having scratched or gouged her assailant." The court detailed her review of each of the three "scholarly exhibits" defendant attached to his postconviction petition. Regarding the exhibits, the court found the articles were inadmissible under Illinois Rule of Evidence 703 (eff. Jan. 1, 2011), and noted the three articles made inconsistent findings and discussed only the significance of finding high level DNA in fingernail scrapings. Defendant's DNA analysis was not high level but contained only a partial profile. The court noted defendant failed to attach "any reports, opinions, or affidavits of any witness concerning the interpretation or the significance of the DNA evidence."

¶ 38        The trial court also found defendant's "newly discovered evidence" was not of such conclusive character as would probably change the result on retrial. The court noted this court's language in affirming defendant's conviction on direct appeal. There, we stated the following:

"The evidence is not closely balanced. Defendant's clothes and boots were stained with Smith's blood, and defendant testified that he was inside Smith's apartment on January 29, 2004, at approximately 4:45 a.m. Expert witness Carter opined that the one-millimeter blood stains on defendant's boots represented medium to high velocity impact. Between Ruch's two telephone calls to Smith's apartment at 5:00 a.m. and 5:01 a.m., the loud noises from Smith's apartment stopped and Miller saw defendant yelling and gesturing toward the house as he walked away."

¶ 39    On July 28, 2017, defendant filed a motion for reconsideration of the trial court's dismissal, asserting (1) the scholarly articles and "uncontradicted DNA findings" were given insufficient consideration as the articles and DNA test results were "other evidence" as referenced by section 122-2 of the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-2 (West 2014)); (2) the court's statement there was no evidence Smith had an opportunity to scratch her attacker with her hands was contrary to the record; and (3) the court failed to consider all the evidence presented at trial in support of defendant's claims. On August 2, 2017, the court denied defendant's motion for reconsideration.

¶ 40    This appeal followed.

¶ 41                                    II. ANALYSIS

¶ 42    As an initial matter, defendant argues only the trial court erred by dismissing his successive postconviction petition, stating "the proper vehicle for his actual innocence claim is the Post-Conviction Hearing Act," and not a petition for relief from judgment pursuant to section 2-1401 of the Civil Procedure Code.

¶ 43                                    A. Postconviction Act

¶ 44       The Postconviction Act provides a remedy for defendants who have suffered a substantial violation of constitutional rights at trial. *People v. Pendleton*, 223 Ill. 2d 458, 471, 861 N.E.2d 999, 1007 (2006). In cases not involving the death penalty, the Postconviction Act sets forth three stages of proceedings. *Pendleton*, 223 Ill. 2d at 471-72, 861 N.E.2d at 1007.

¶ 45       At the first stage, the circuit court independently reviews the defendant's postconviction petition and determines whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2014). If it finds the petition is frivolous or patently without merit, the court must dismiss the petition. 725 ILCS 5/122-2.1(a)(2) (West 2014). If the court does not dismiss the petition, it proceeds to the second stage, where, if necessary, the court appoints the defendant counsel. *Pendleton*, 223 Ill. 2d at 472, 861 N.E.2d at 1007. Defense counsel may amend the defendant's petition to ensure his or her contentions are adequately presented. *Pendleton*, 223 Ill. 2d at 472, 861 N.E.2d at 1007. Also at the second stage, the State may file a motion to dismiss the defendant's petition or an answer to it. *Pendleton*, 223 Ill. 2d at 472, 861 N.E.2d at 1008. If the State does not file a motion to dismiss or the court denies such a motion, the petition advances to the third stage, wherein the court holds a hearing at which the defendant may present evidence in support of his or her petition. *Pendleton*, 223 Ill. 2d at 472-73, 861 N.E.2d at 1008.

¶ 46       Additionally, the Postconviction Act contemplates the filing of only one petition without leave of court. 725 ILCS 5/122-1(f) (West 2014). The defendant forfeits any claim not presented in the original or amended petition. 725 ILCS 5/122-3 (West 2014). Our supreme court has "identified two bases upon which the bar against successive petitions will be relaxed." *People v. Sanders*, 2016 IL 118123, ¶ 24, 47 N.E.3d 237. The first exception is when the defendant satisfies the cause and prejudice test. 725 ILCS 5/122-1(f) (West 2014); *People v.*

*Pitsonbarger*, 205 Ill. 2d 444, 459, 793 N.E.2d 609, 621 (2002). The second is known as the fundamental miscarriage of justice exception, requiring the defendant demonstrate actual innocence. *Sanders*, 2016 IL 118123, ¶ 24.

¶ 47                    B. Second Stage Dismissal of Defendant's Successive Postconviction Petition

¶ 48            In this case, the State did file a motion to dismiss defendant's successive postconviction petition at the second stage of the proceedings, and the trial court granted that motion. Defendant challenges the dismissal, asserting he had made a substantial showing of actual innocence. The State disagrees.

¶ 49            At the second stage of the postconviction proceedings, the circuit court is concerned only with determining whether the petition's allegations sufficiently show a constitutional infirmity that would necessitate relief under the Postconviction Act. *People v. Coleman*, 183 Ill. 2d 366, 380, 701 N.E.2d 1063, 1071 (1998). At this stage, "the defendant bears the burden of making a substantial showing of a constitutional violation" and "all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." *Pendleton*, 223 Ill. 2d at 473, 861 N.E.2d at 1008. "[T]he 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767. The court reviews the petition's factual sufficiency as well as its legal sufficiency in light of the trial court record and applicable law. *People v. Alberts*, 383 Ill. App. 3d 374, 377, 890 N.E.2d 1208, 1212 (2008). However, the court is prohibited from engaging in any fact-finding. *Coleman*, 183 Ill. 2d at 380-81, 701 N.E.2d at 1071. When a defendant raises a claim of actual innocence, the relevant inquiry at the second stage of postconviction review is

- 13 -

whether the defendant has made a substantial showing of actual innocence to warrant an evidentiary hearing. *People v. Rivera*, 2016 IL App (1st) 132573, ¶ 30, 64 N.E.3d 1. We review *de novo* the trial court's dismissal of a postconviction petition at the second stage. *Pendleton*, 223 Ill. 2d at 473, 861 N.E.2d at 1008.

¶ 50    "The evidence of actual innocence must be (1) newly discovered, (2) not discoverable earlier through the exercise of due diligence, (3) material and not merely cumulative, and (4) of such conclusive character that it would probably change the result on retrial." *Sanders*, 2016 IL 118123, ¶ 24. The "conclusiveness of the new evidence is the most important element of an actual innocence claim." *Sanders*, 2016 IL 118123, ¶ 47. The defendant's new evidence must be "so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47. In its motion to dismiss, the State asserted defendant failed to make a substantial showing of actual innocence because his new evidence was not (1) material and (2) of such conclusive character that it would probably change the result on retrial.

¶ 51    Defendant contends the new DNA evidence clearly shows another male struggled with Smith before her death leaving his DNA underneath Smith's fingernails, and thus, defendant is innocent of first degree murder. We clarify the new DNA evidence defendant references is a partial Y-STR profile obtained from Smith's left-hand fingernail scrapings, excluding defendant as a contributor of the male DNA; no Y-STR profile was obtained from Smith's right-hand fingernail scrapings.

¶ 52    We note "DNA, in and of itself, does not confirm the commission of a crime; rather, it confirms an individual's identity." *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 31, 962 N.E.2d 53; see also *People v. Hunter*, 358 Ill. App. 3d 1085, 1093, 831 N.E.2d 1192, 1198

(2005) (quoting *People v. Hall*, 352 Ill. App. 3d 537, 549, 736, 816 N.E.2d 703, 713-14 (2004)). Thus, DNA evidence that does not match a defendant's DNA does not exonerate the defendant. *Rivera*, 2011 IL App (2d) 091060, ¶ 31; see also *People v. Allen*, 377 Ill. App. 3d 938, 944, 880 N.E.2d 223, 228 (2007) (stating that "[t]he absence of defendant's DNA on the gun would not conclusively establish that he did not handle the gun or that he did not commit the *** robbery").

¶ 53            Defendant asserts the trial court "misread[ ] the record" when it found the new DNA evidence was not material "because 'there was no evidence that Smith had an opportunity to scratch her attacker with her hands,' nor were there any injuries to Smith's hands that would have established that she scratched her attacker." Defendant asserts *People v. Rozo*, 2012 IL App (2d) 100308, 970 N.E.2d 544, is instructive on the issue of "materiality of fingernail scrapings to the question of the identity of the offender." However, the issue in *Rozo* was whether the trial court erred in denying defendant's motion for DNA testing pursuant to section 116-3 of the Criminal Procedure Code (725 ILCS 5/116-3 (West 2008*)). Rozo*, 2012 IL App (2d) 100308, ¶ 1. Section 116-3 requires the defendant demonstrate that the result of the requested forensic DNA testing "has the scientific *potential* to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant." (Emphasis added.) 725 ILCS 5/116-3(c)(1) (West 2014). In *Rozo*, the defendant requested the testing of "tissue and/or blood samples" that had been found under the murder victim's fingernails. The appellate court reversed the trial court's denial of the defendant's motion finding the evidence "would tend to significantly advance defendant's claim of actual innocence such that testing should have been ordered." *Rozo*, 2012 IL App (2d) 100308, ¶ 19.

¶ 54        In this case, the trial court entered an agreed order on May 16, 2013, for forensic testing of fingernail scrapings "collected in sexual assault evidence collection kit of Amy Smith." Defendant is not challenging the denial of a motion for forensic testing as was the issue in *Rozo*; he is challenging the dismissal of his successive postconviction petition claiming actual innocence based on newly discovered evidence. Thus, defendant must make a substantial showing of actual innocence so as to warrant an evidentiary hearing (*Rivera*, 2016 IL App (1st) 132573, ¶ 30) and the evidence of actual innocence must be "material and not merely cumulative" (*Sanders*, 2016 IL 118123, ¶ 24). We find *Rozo* to be of limited application to the instant case.

¶ 55        In support of his claim the new evidence is material, defendant contends Dr. Mitchell testified: (1) Smith fought with her killer, (2) Smith suffered "defensive wounds" to her arms and hands, (3) "that victims who struggle with their attackers often scratch them," (4) Smith "could have scraped her killer," (5) Smith may have "clawed at or scratched" her killer, (6) Smith "struggled with her attacker such that her killer's DNA would be under her fingernails" and (7) he "scraped under Smith's fingernails for biological material *because* victims who struggle with their attackers often scratch the offender." (Emphasis in original.) Contrary to defendant's contentions, Dr. Mitchell testified he observed multiple injuries during his examination of Smith, including abrasions to the left elbow, left inner forearm, outer left forearm, a "watch band abrasion" which Dr. Mitchell opined would be consistent with the hand raised, injuries to the back of the right hand, right wrist and forearm abrasions, a laceration to the right index finger and abrasions to the right palm, right elbow, and right forearm. Dr. Mitchell stated many of the abrasions were consistent with "defensive injuries," which he defined as wounds to the forearms and backs of the hands "that would be consistent with someone trying to

ward off an attack from either a blunt object, or to protect themselves from a sharp object." According to Dr. Mitchell, Smith suffered "defensive injuries" to the backs of her hands and left forearm.

¶ 56        On cross-examination, Dr. Mitchell acknowledged Smith "struggled" with her attacker as evidenced by the photographs. The following colloquy ensued:

> "Q. All right. When there's a physical altercation or you'd think or believe that may have been physical contact between the assailant and a victim, it is not uncommon for victims to attempt to scratch or otherwise injure the attacker, isn't that true?
>
> A. They may.
>
> Q. Well, it's part of your duties as forensic pathologist to check and scrape under the fingernails for any possible evidence there, isn't that correct?
>
> A. That's correct.
>
> Q. And in this case you did in fact scrape the fingernails of Amy Smith, correct?
>
> A. Yes, we did."

¶ 57        The record does not support defendant's contention Smith clawed, scraped, or scratched her killer. Although Dr. Mitchell agreed a victim in an altercation *may* attempt to scratch or injure her attacker, the evidence in the instant case showed only that Smith suffered "defensive injuries" to the backs of her hands and left forearm. According to Dr. Mitchell, Smith's injuries were indicative of her attempt to shield her body from the objects used in her murder. There was no evidence of Smith clawing or scratching her killer. Moreover, Dr. Mitchell testified, although there was no evidence Smith had been sexually assaulted, he administered the sexual assault kit, gathering samples of Smith's hair, fingernail scrapings, and blood, *because* it

was a "standard kit for this type of incident" and not because Smith may have clawed or scratched her offender as defendant asserts.

¶ 58    Thus, we find the trial court did not err in finding the new DNA evidence was not material because there was no evidence Smith had an opportunity to scratch her attacker with her left-hand fingernails and there were no injuries to Smith's hands that would establish she scratched her attacker.

¶ 59    Defendant further argues the trial court should have ordered discovery or appointed an expert to interpret the new DNA evidence, thus enabling the court to find the new evidence material. Defendant cites three cases in support of his argument. In *People v. Fair*, 193 Ill. 2d 256, 263, 738 N.E.2d 500, 504 (2000), the supreme court found the trial court erred when it denied *defendant's request* for postconviction discovery to uncover the full extent of alleged judicial corruption. In *People v. Jakes*, 2013 IL App (1st) 113057, ¶ 35, 2 N.E.3d 481, the appellate court found the trial court erred when it denied *defendant's motion* for postconviction discovery alleging police misconduct. In *People v. Wilson*, 191 Ill. 2d 363, 382-83, 732 N.E.2d 498, 508 (2000), the supreme court found the trial court did not err in denying *defendant's motion* for postconviction appropriation of funds to hire an expert. Here, defendant did not file a postconviction motion for (1) discovery or (2) the appointment of an expert. Thus, we find no error.

¶ 60    Defendant next argues the trial court erred in finding he failed to make a substantial showing of actual innocence because his new DNA evidence was not of such conclusive character that it would probably change the result on retrial. As we stated above, the "conclusiveness of the new evidence is the most important element of an actual innocence claim." *Sanders*, 2016 IL 118123, ¶ 47. As an initial matter, we clarify defendant's new evidence

must be "so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47. We note further, at the second stage of the postconviction proceedings, "all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." *Pendleton*, 223 Ill. 2d at 473, 861 N.E.2d at 1008.

¶ 61    Defendant again contends the new DNA evidence clearly shows another male struggled with Smith before her death, leaving his DNA underneath Smith's left-hand fingernails, and thus, he is innocent. He argues the evidence of his guilt was entirely circumstantial and failed to establish motive for defendant to have so brutally murdered Smith.

¶ 62    We have already determined there was no evidence Smith scratched her attacker. We note further there was no evidence of another male at the scene near the time of the murder. Miller testified she heard a loud crashing sound coming from Smith's apartment and a low muffled voice uttering what sounded like "unnh" over and over again. Ruch telephoned Smith's apartment at approximately 5 a.m. and could hear the telephone ringing through the vent. Smith did not answer. Miller next heard an individual moving swiftly up the basement stairs and leaving through Smith's apartment door. Through her apartment window, Miller saw a black male yelling and gesturing toward the house as he walked away. She recognized the individual as someone she had seen at Smith's door two weeks earlier and identified defendant as that individual.

¶ 63    Moreover, defendant admitted he was present in Smith's apartment at approximately 4:45 a.m., finding Smith lying on the floor in a pool of blood. Defendant testified he held Smith's head in his hand and found his hands full of blood. He shook his hands, wiped them on his pants, and ran from the scene. However, expert witness Carter testified the

- 19 -

bloodstain patterns on defendant's boots were consistent with "impact spatter." Carter also examined 12 crime-scene photographs, identifying evidence of blood flight in the photographs.

¶ 64    Defendant's testimony Smith was alive when he found her is contradicted by the record. Defendant argues Dr. Mitchell's statement the stab wounds were sustained "perimortem" implies the stab wounds were made before Smith's death. He defines "perimortem" as "taking place at or around the time of death." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/medical/perimortem (last visited Jan. 8, 2020). However, the timeframe, "around the time of death," contradicts Dr. Mitchell's testimony there was little evidence to suggest Smith's heart was pumping blood at the time she sustained the stab wounds. At defendant's sentencing hearing, the trial court found defendant's explanation as to his presence in Smith's apartment on January 29, 2004, "preposterous," noting defendant's "demeanor while testifying spoke volumes."

¶ 65    Moreover, DNA test results indicated the blood on defendant's boots, left sock, and coat matched Smith's DNA profile. When defendant was asked how Smith's blood got on the back of his coat, defendant replied, "Well, I couldn't tell you. Maybe it flew up in the air and came down." Expert witness Carter opined the blood stains on defendant's boots included stains made at "medium to high impact," which could not have been produced by defendant shaking blood off his hands. In addition, the tread pattern on defendant's boot was consistent with a pattern abrasion on Smith's skull. Defendant attempted to rid himself of these clothes after leaving Smith's apartment. In addition, when he was initially arrested, defendant told police he had not seen Smith on January 28 or 29.

¶ 66    Given the overwhelming evidence establishing defendant's guilt, we cannot find the absence of defendant's DNA underneath Smith's left-hand fingernails to be of such

conclusive character as would probably change the result on retrial. Accordingly, defendant failed to make a substantial showing of actual innocence, and we affirm the trial court's grant of the State's motion to dismiss.

¶ 67                                B. Reasonable Assistance of Postconviction Counsel

¶ 68           Alternatively, defendant argues his postconviction counsel failed to comply with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013). Specifically, defendant argues postconviction counsel failed to provide him a reasonable level of assistance where counsel failed to support defendant's successive postconviction petition with an affidavit from an expert witness "explaining the significance of the DNA results which showed [defendant's] DNA was not recovered under murder victim Amy Smith's fingernails."

¶ 69           Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013) "imposes specific obligations on postconviction counsel to assure the reasonable level of assistance required by the Act." *People v. Lander*, 215 Ill. 2d 577, 584, 831 N.E.2d 596, 600 (2005). Under that rule, postconviction counsel must (1) consult with the defendant either by mail or in person to ascertain the contentions of deprivation of constitutional rights, (2) examine the record of the trial court proceedings, and (3) make any amendments to the *pro se* petition necessary for an adequate presentation of the defendant's contentions. *People v. Perkins*, 229 Ill. 2d 34, 42, 890 N.E.2d 398, 403 (2007). Our supreme court has consistently held remand is required when postconviction counsel fails to complete any one of the above duties, regardless of whether the claims raised in the petition have merit. *People v. Suarez*, 224 Ill. 2d 37, 47, 862 N.E.2d 977, 982 (2007). Postconviction counsel's filing of a Rule 651(c) certificate raises a presumption that counsel provided reasonable assistance under the Postconviction Act, namely, that counsel

adequately investigated, amended, and properly presented the defendant's claims. *People v. Jones*, 2011 IL App (1st) 092529, ¶ 23, 955 N.E.2d 1200.

¶ 70 Here, defendant argues postconviction counsel failed to comply with Rule 651(c) by failing to attach to defendant's successive postconviction petition an affidavit from an expert witness explaining the significance of the newly discovered DNA evidence. However, despite the trial court requiring postconviction counsel to file multiple Rule 651(c) certifications stating he complied with the rule, "Rule 651(c) applies only to a postconviction petition initially filed by a *pro se* defendant." *People v. Cotto*, 2016 IL 119006, ¶ 41, 51 N.E.3d 802. As defendant's successive postconviction petition was initially filed by counsel, we do not address postconviction counsel's compliance with Rule 651(c).

¶ 71 Even without Rule 651, the Postconviction Act requires a defendant receive reasonable assistance of postconviction counsel. See *Lander*, 215 Ill. 2d at 583-84, 831 N.E.2d at 600 (quoting *People v. Owens*, 139 Ill. 2d 351, 364, 564 N.E.2d 1184, 1189 (1990)). "Reasonable assistance" is a lesser requirement than "effective assistance" described in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Zareski*, 2017 IL App (1st) 150836, ¶ 50, 84 N.E.3d 527. We note, "[s]trictly speaking, a defendant is entitled to less from postconviction counsel than from direct appeal or trial counsel. The flip side of this principle is that it should be even more difficult for a defendant to prove that he or she received unreasonable assistance than to prove he or she received ineffective assistance under *Strickland*." *Zareski*, 2017 IL App (1st) 150836, ¶ 50. Because the Postconviction Act generally requires a reasonable level of assistance and applies to all petitions, both appointed and retained postconviction counsel must provide a reasonable level of assistance to postconviction defendants at second-stage proceedings. See *Cotto*, 2016 IL 119006, ¶ 41.

¶ 72       In this case, we cannot say defendant's postconviction counsel failed to provide him a reasonable level of assistance. Defendant focuses on his counsel's failure to attach an affidavit from an expert "explaining the significance of the DNA results." As stated above, the new DNA evidence presented by defendant does not show he did not commit the crime for which he was convicted. The record does not support defendant's contention Smith clawed, scraped, or scratched her killer. Even if the newly discovered DNA evidence had been presented with an expert affidavit as to its materiality, the overwhelming evidence against defendant would not make it more likely than not no reasonable juror would find defendant guilty beyond a reasonable doubt. Moreover, such evidence would not be of such a conclusive character as would probably change the result on retrial. Thus, no prejudice has been demonstrated.

¶ 73       Although differences in DNA analysis testing results may be critical in many instances, this is not one of them because the new DNA evidence defendant has presented does not show defendant's actual innocence in this case. Thus, we find defendant's claim of unreasonable assistance of postconviction counsel is without merit.

¶ 74                   III. CONCLUSION

¶ 75       For the reasons stated we affirm the trial court's judgment.

¶ 76       Affirmed.