2022 IL App (1st) 200388

No. 1-20-0388

Third Division
September 7, 2022

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court |
|  | ) | of Cook County. |
| Plaintiff-Appellee, | ) |  |
|  | ) | No. 94 CR 26967-03 |
| v. | ) |  |
|  | ) | The Honorable |
| MITCHELL MORROW | ) | Angela Munari Petrone, |
|  | ) | Judge Presiding. |
| Defendant-Appellant. | ) |  |
|  | ) |  |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Ellis and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1        After a jury trial, defendant, Mitchell Morrow, was convicted of first degree murder and armed robbery and sentenced to concurrent terms of 60 years for murder and 20 years for armed robbery with the Illinois Department of Corrections (IDOC). On direct appeal, this court vacated his conviction for armed robbery but affirmed his murder conviction. Defendant was convicted in part based on the pretrial statements and grand jury testimony of one alleged witness, Ramona Siler, who told the police and grand jury that she performed oral sex on the victim shortly before defendant shot the victim. Siler recanted her account of the murder at

trial, but her statements and grand jury testimony were published to the jury. Since his conviction, defendant has asserted his actual innocence and sought forensic testing of a condom recovered from the victim's clothing in order to show that Siler did not perform oral sex on the victim and that her statements to police and before the grand jury were therefore false. Most recently, defendant filed several motions under section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2018)), requesting an order compelling Siler to submit a buccal swab for further forensic testing and comparison analysis, which the trial court denied. For the following reasons, we affirm.

¶ 2                                                       BACKGROUND

¶ 3        This court has considered various issues raised by defendant in connection with his conviction and sentence for first degree murder on at least three prior occasions, including affirming the dismissal of two prior postconviction petitions. A detailed recitation of the evidence and trial testimony can therefore be found in our prior decisions, which we hereby incorporate by reference and from which the following relevant facts are drawn. See *People v. Morrow*, 303 Ill. App. 3d 671 (1999) (*Morrow I*); *People v. Morrow*, 2013 IL App (1st) 121316 (*Morrow II)*; *People v. Morrow*, 2019 IL App (1st) 161208 (*Morrow III)*.

¶ 4                                                        I. Trial

¶ 5        The evidence at trial established that on August 28, 1994, the victim, Kazmierz Kosinski, was discovered dead in the driver's seat of his vehicle on Leclaire Avenue near Blackhawk Park in Chicago. Kosinski had suffered three gunshot wounds, one to the right wrist, one to the chest, and one to the right hip. Defendant, along with two codefendants, were subsequently charged by indictment with murder and armed robbery.

¶ 6     The State's case at trial relied primarily on the prior statement and grand jury testimony of Siler, an alleged eyewitness to the murder. Siler's initial statements to investigators were introduced to the jury through the testimony of Detective William Johnston. Johnston testified that he investigated Kosinski's murder and that he initially thought it was related to prostitution because the victim was found near Blackhawk Park, a place known for prostitution, and a used condom was recovered inside the victim's clothing. A week after the murder, Johnston learned that a prostitute named Ramona Siler, who usually worked nearby, had not been observed for several days following the murder. Police officers later observed Siler in the area and arrested her on a bond forfeiture warrant. Following her arrest, Siler was questioned concerning Kosinski's murder. Siler initially told detectives that she did not know anything about Kosinski's death and that she needed to be released from custody so that she could attend to her children, who were alone in a hotel room. When officers went to the hotel to check on the children, they found defendant, Siler's pimp, alone in the hotel room. Defendant told the officers that Siler's children did not live there, but defendant agreed to go to the police station for an interview.

¶ 7     Back at the station, the interview with Siler resumed. This time, Siler stated that she did have information concerning the murder near Blackhawk Park. On the night of the shooting, Siler was working "her corner," which was the intersection of Dickens and Cicero Avenues, with another prostitute, named Birandi "Brittany" Paschal. Defendant and Alanda "JR" McComb, Paschal's pimp, were also present that evening.[1]

_____

[1]Paschal and McComb were also indicted for armed robbery and the murder of Kosinksi. Paschal was tried by jury and found guilty of both armed robbery and murder. McComb was acquitted of all charges following a bench trial.

¶ 8    Siler told detectives that, at 2 a.m., a prior customer pulled up to Siler and motioned for her to approach his vehicle. The customer told Siler that he wanted to hire two prostitutes, and he pointed to Paschal. Siler and Paschal both entered the customer's vehicle, and he drove to a location near Blackhawk Park. Defendant and McComb followed behind them in their own vehicle and parked in front of the customer.

¶ 9    After the customer parked his vehicle, Siler put a condom on Kosinski and performed oral sex on him. Siler eventually stopped and told the customer that his "time was up," but he reached into the vehicle's visor and handed Siler $10, and she resumed. Shortly thereafter, Paschal reached into the customer's pants for his wallet, and a physical struggle ensued. Siler exited the vehicle and shouted for defendant and McComb to come and help. Defendant and McComb ran to the customer's vehicle, and McComb punched Kosinski. Defendant then pulled out a small, semiautomatic handgun and shot Kosinski twice. Siler observed the muzzle of the gun flash, and she heard both shots.

¶ 10    After the shooting, Siler and Paschal returned to McComb and defendant's vehicle, and they drove away with the victim's wallet. McComb handed the victim's wallet to Paschal, who then removed $160 in cash and divided it equally amongst the group before throwing the wallet out the vehicle's window. At some point, they stopped and McComb hid the gun underneath the hood of the vehicle, and they continued to drive away.

¶ 11    Siler said that at the time of the shooting, she had been using $40 of heroin per day and that defendant used $200 of heroin daily. Up until this point in the interview, detectives had not shown Siler any photographs of the crime scene or potential suspects.

¶ 12    Siler remained in police custody overnight following her interview. The next day, Siler provided a written statement in the presence of an assistant state's attorney. That statement was

4

admitted in evidence and published to the jury at trial. Siler's account in her statement was substantially similar to what she told police. However, through her statement, Siler added that although she did not know the man's name at the time, she identified the customer who she picked up on August 28, 1994, as the victim, Kosinski, in a Polaroid photograph, which she signed. Siler's statement concluded with an acknowledgement that she was treated well by the assistant state's attorney and the police and that she was not threatened in any way. Siler also stated that she was not offered any promises in exchange for giving her statement and that she was not under the influence of any drugs or alcohol at the time.

¶ 13   A transcript of Siler's grand jury testimony was also admitted in evidence and published to the jury at trial. Before the grand jury, Siler testified to substantially similar facts as those she provided to police in her initial interview and those recorded in her statement to the assistant state's attorney.

¶ 14   On the witness stand at trial, Siler confirmed that in August 1994, she worked as a prostitute and defendant was her pimp. Defendant was also her boyfriend of nearly four years at that time, and they had lived together in a hotel for two years. Siler typically performed sex acts for customers in their vehicles, while defendant would "protect" her, meaning that he would follow Siler and park nearby and help her if she was in danger. Siler identified defendant in court.

¶ 15   However, Siler recanted her prior account of the murder. She initially testified at trial that she was working as a prostitute at the intersection of Dickens and Cicero Avenues during the early morning hours of August 28, 1994, but then testified that she did not remember the exact dates when she was working. Siler then denied knowing who Kosinski was and testified that she was not with Kosinski, defendant, Paschal, or McComb on the night of Kosinski's death.

5

The State asked Siler about a number of specific statements she made in her prior written statement and grand jury testimony, and Siler admitted to providing those statements.

¶ 16 On cross-examination, Siler testified that she lied to the police because she was a heroin addict, and she did not want to suffer from withdrawal while in jail. When Siler was arrested, she lied to the police that she had children alone in her hotel room because she believed she would be released from custody if she told the police that her children were alone. Detective Johnston then interviewed Siler concerning Kosinski's death, and Siler was not released from custody even though she told him that she did not know anything about the murder. According to Siler, she then made up a story based on the photographs that Johnston showed her, and she implicated defendant and McComb, the only two pimps she knew, in the shooting. Siler was still in custody when she testified before the grand jury, and she was going through heroin withdrawal at the time. She admitted that she lied under oath because she thought she would be able to go home and avoid a murder charge if she implicated the offenders. Siler was in fact released without charges after she testified before the grand jury.

¶ 17 Defendant testified in his own defense and denied shooting Kosinski. Defendant admitted that he was Siler's pimp and that she frequently worked at the intersection of Dickens and Cicero Avenues. Defendant would sometimes follow Siler to protect her from other pimps, but he denied being present the night Kosinski was murdered. Defendant explained that he was previously in a relationship with Siler, but that he was no longer in a relationship with her in August 1994.

¶ 18 On cross-examination, defendant admitted that he was previously Siler's pimp and boyfriend and that McComb was Paschal's pimp. However, defendant denied working with McComb, and he testified that he did not carry a gun. Defendant admitted that he was addicted

6

to heroin in August 1994. Defendant further testified that he had lied to the police and provided false names on several occasions. Defendant admitted speaking to detectives shortly after the shooting but denied telling them that he had spent every night with Siler except the night of the shooting.

¶ 19    Forensic investigator Carl Brasic testified that, on August 28, 1994, he processed the crime scene. There, Brasic observed Kosinski's body in the driver's seat of his vehicle, which was parked on Leclaire Avenue near Blackhawk Park in Chicago. Both of the vehicle's front seats were reclined, and Brasic recovered a condom wrapper on the floor of the vehicle. Brasic recovered three .25-caliber cartridge cases inside the vehicle. No weapons were recovered in the vehicle or on Kosinski's person. Kosinski appeared to have a gunshot wound on his left chest and right wrist, but his face did not appear to be injured. Brasic recovered several palm prints on the outside of Kosinski's vehicle.

¶ 20    The parties stipulated that Victoria Psichalinos would testify that she is an expert fingerprint examiner and that she examined the palm prints recovered from the outside of Kosinski's vehicle. Psichalinos compared those prints to individual palm prints taken from defendant, Siler, McComb, Paschal, and Kosinski, and she opined that they did not match the prints recovered from the vehicle.

¶ 21    Dr. Mitra Kalelkar testified that she performed the autopsy on Kosinski's body. Prior to the autopsy, Kalelkar observed a used condom inside Kosinski's clothing and a bullet on the cart on which Kosinski's body was lying. Kosinski did not have any bruises or injuries to his face, but he had three apparent gunshot wounds to his body. Kosinski was shot once in the left chest wall, and the bullet traveled to the right and down to his spinal cord, where the bullet was recovered. Kosinski also sustained a gunshot wound to his right wrist, and the bullet entered

7

his inside palm and exited through the wrist. Kalelkar observed evidence that both gunshots were contact wounds, meaning that the barrel of the gun was touching Kosinski's skin when it was fired. Kosinski had a third gunshot graze wound on his right hip, but there was no evidence that the shot was fired from close range. Kalelkar opined that Kosinski died as a result of multiple gunshot wounds and that the manner of his death was a homicide.

¶ 22    Police officer Richard Chenow, a ballistics expert, testified that he examined the three cartridge cases recovered from the vehicle, but he could not determine whether they were fired from the same gun. Also, he examined two bullets recovered from the crime scene, but they were mutilated and unsuitable for comparison.

¶ 23    The parties stipulated that a pedestrian recovered Kosinski's wallet and placed it in a mailbox on August 28, 1994. Psichalinos, the expert fingerprint examiner, examined three fingerprints recovered from inside the wallet and opined that they did not match the individual fingerprint samples provided by defendant, Siler, McComb, Paschal, or Kosinski.

¶ 24    The jury found Morrow guilty of first degree murder and armed robbery, and the trial court sentenced Morrow to 60 years for murder and 20 years for armed robbery, to be served concurrently.

¶ 25                    II. Direct Appeal and Prior Collateral Proceedings

¶ 26    On direct appeal, defendant argued that the State failed to prove him guilty beyond a reasonable doubt of first degree murder and armed robbery or, alternatively, that he was entitled to a new trial due to evidentiary issues and ineffective assistance of trial counsel. *Morrow I*, 303 Ill. App. 3d at 675, 682-83. This court affirmed defendant's murder conviction, but reversed his armed robbery conviction. Defendant filed a petition for leave to appeal in the Illinois Supreme Court, which was denied. *People v. Morrow*, 184 Ill. 2d 567 (1999) (table).

¶ 27 While defendant's petition for leave to appeal was pending in the Illinois Supreme Court, on April 23, 1999, defendant, through counsel, filed a postconviction petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)), claiming that his trial counsel was ineffective for failing to adequately investigate the case, that defendant was denied the right to choose the form of trial and whether to testify on his own behalf, that his sentences were excessive, and that trial counsel was ineffective for allowing defendant to be sentenced without a presentence investigation report. In an accompanying affidavit, Siler swore that she gave her statements to police, the assistant state's attorney, and the grand jury after police had told her that she would lose custody of her children if she did not give a statement and that defendant had implicated her in the murder. She was also under the influence of heroin or suffering the effects of withdrawal while she was in custody. The trial court summarily dismissed the petition, and this court affirmed the dismissal. *People v. Morrow*, No. 1-00-3878 (2002) (unpublished order under Illinois Supreme Court Rule 23).

¶ 28 On February 11, 2010, defendant filed a *pro se* motion for state *habeas* relief, which the trial court dismissed. This court affirmed the dismissal on appeal. *Morrow v. Ryker*, No. 1-10-1243 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 29 On February 15, 2011, defendant filed a *pro se* petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)). The petition alleged that the indictment was "fatally defective as duplicitous." The trial court dismissed the petition as "frivolous and without merit." This court affirmed. *People v. Morrow*, No. 1-11-2279 (2012) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 30 On December 5, 2011, while defendant's appeal of his February 15, 2011, *pro se* section 2-1401 petition was still pending, defendant filed his first motion for leave to file a successive

9

petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). In the proposed successive petition, defendant argued that his appellate counsel was ineffective for not arguing on direct appeal that defendant's trial counsel was ineffective for failing to request second degree murder jury instructions. See *Morrow II*, 2013 IL App (1st) 121316, ¶ 50. This court affirmed, finding that "counsel's decision not to request a second-degree murder instruction was appropriate as a matter of trial strategy." *Morrow II*, 2013 IL App (1st) 121316, ¶ 53. On January 30, 2014, this court denied defendant's petition for rehearing. On May 28, 2014, the supreme court denied his petition for leave to appeal. *Morrow II*, 2013 IL App (1st) 121316, *appeal denied*, No. 117413 (Ill. May 28, 2014).

¶ 31        On April 1, 2013, defendant filed another *pro se* petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2012)), arguing that his sentence was void because the trial court sentenced him to concurrent terms of 60 years for murder and 20 years for armed robbery, when consecutive terms were statutorily required. On April 9, 2013, the trial court signed an order releasing the record to a public defender. On September 5, 2013, defendant filed a second *pro se* motion for leave to file a successive petition, alleging that the State knowingly presented perjured testimony from Siler at his trial. The disposition of this motion for leave is not included in the record on appeal.

¶ 32        On February 13, 2014, defendant, through counsel, filed a third motion for leave to file a different successive petition, in which defendant argued that the appellate court erred by failing to remand for resentencing when it vacated the armed robbery conviction, that appellate counsel was ineffective for failing to ask the appellate court to remand for resentencing, that defendant's postconviction attorneys were ineffective for failing to raise the ineffective assistance of appellate counsel, and that defendant's 60-year sentence was excessive in light

10

of his criminal history of only misdemeanor offenses. The trial court's denial of defendant's third motion for leave to file a successive petition was affirmed on appeal. See *Morrow III*, 2019 IL App (1st) 161208.

¶ 33                                    III. Motions for Forensic Testing

¶ 34        On March 1, 2013, defendant filed a *pro se* "Motion for Forensic DNA Testing and Integrated Ballistic Identification System Testing Regarding Actual Innocence" pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2012)). Section 116-3 provides for postconviction analysis of forensic evidence if certain statutory requirements are met, as more fully explained in the analysis section of this opinion. In defendant's motion, he requested forensic testing on multiple pieces of trial evidence, including the condom found with the victim, the bullets, and the shell casings from the victim's vehicle to support his claim of actual innocence. Regarding the condom, defendant claimed the requested analysis had "the scientific potential to produce new, noncumulative evidence materially relevant to [his] assertion of actual innocence even though the results may not completely exonerate him, where the result of the testing would produce a genetic profile of the person which with whom [the victim] had sex at the time of his death."

¶ 35        On October 2, 2014, the parties entered into an "Agreed Order for Post-Conviction DNA Testing and Ballistic Testing Pursuant to 725 ILCS 5/116-3" for the three shell casings, two bullets, and the condom. The parties also agreed to obtain a saliva sample from defendant to have a DNA profile for comparison. The evidence was sent to the Illinois State Police (ISP) Forensic Center for testing. On January 28, 2016, attorneys from Northwestern University's Bluhm Legal Clinic filed appearances on behalf of defendant. On August 29, 2016, the parties entered into another "Agreed Order for Post-Conviction DNA Testing Analysis Pursuant to

11

725 ILCS 5/116-3," which allowed the legal clinic to pay for additional testing of the condom by Bode Cellmark Forensics (Bode), a private forensics laboratory located in Virginia.

¶ 36 According to the parties' appellate briefs, both ISP and Bode issued separate reports, which are not included in the record on appeal. Both labs identified a male DNA profile that matched the victim's DNA on the condom but were unable to identify any other profile. No additional contributors could be identified. There were no open profiles to compare to others or to upload into the Combined DNA Index System (CODIS).

¶ 37 On September 7, 2018, the Bluhm Legal Clinic ended its representation of defendant. In a letter informing defendant of the clinic's termination of their representation, Bluhm Legal Clinic wrote:

"We hired a private investigator who was finally able to locate Ms. Siler. Unfortunately, she was not interested in cooperating with us or even discussing your case with us. He also found some relatives of Ms. Paschal but she does not want to talk with, us either. Without their cooperation, there is nothing else we can do to advance your case."

¶ 38 On September 14, 2018, petitioner mailed a *pro se* "Motion for Order Allowing DNA Extraction" to the circuit court requesting an order compelling Paschal and Siler to submit buccal swabs to compare their DNA profiles to an unknown profile that was developed using TrueAllele[2] DNA testing of the material on the condom.

---

[2]According to an article submitted by defendant in response to the State's June 20, 2019, motion to dismiss, entitled "Defense Attorneys Seek Access to DNA-Matching Software's Source Code," TrueAllele DNA testing utilizes a proprietary software to analyze evidence that contains a mixture of genetic material and determine whether that mixture contains a match to other genetic material. The article notes that "Law enforcement uses TrueAllele to test mixtures of DNA usually found at crime scenes" where "[c]onventional crime labs often refuse to calculate the probability that a suspect

12

¶ 39        On October 3, 2018, defendant, acting *pro se*, filed his fourth motion for leave to file a successive postconviction petition, which also asserted the need for Siler's DNA sample. In his proposed petition, defendant maintained that "comparison analysis of the partial DNA profile from the condom to the DNA profile of Ramona Siler, using TrueAllele DNA Testing, will exclude her as a possible donor, and thereby, exonerate him."

¶ 40        On April 25, 2019, defendant filed a "Motion for Discovery in a Postconviction Proceeding" requesting again that Siler be compelled to submit a buccal swab for DNA testing pursuant to section 116-3.

¶ 41        On June 20, 2019, the State filed a motion to dismiss defendant's requests for a court order compelling Siler to submit buccal swabs for testing. The State argued, in part, that section 116-3 "does not suggest that new evidence should be made in order to conduct post-conviction testing; the statute allows for evidence gathered and recovered at the time of the crime to be tested," and further argued that any order to compel a buccal swab from Siler without probable cause for her arrest would run afoul of the fourth amendment of the United States Constitution. See U.S. Const., amend. IV.

¶ 42        Defendant filed a response to the State's motion to dismiss, arguing that the State's motion was unauthorized by statute, that the State waived objection to the DNA testing requested, that section 116-3 allows for such testing, and that DNA extraction from Siler would not violate the fourth amendment. In his response, defendant also attached an e-mail from Greg Hampikian of Boise State University, discussing results generated by Cybergenetic's

---

contributed DNA in weak and contaminated crime scene samples, rejecting test results below a certain threshold of reliability."

TrueAllele DNA testing of the condom sample, which occurred while Bluhm Legal Clinic represented defendant. The e-mail, which was addressed to counsel, stated in relevant part:

"The [TrueAllele] software identified a new unknown profile that can be compared to reference samples from possible contributors. *** In agreement with the earlier DNA analysis, Mitchell Morrow is excluded from all the condom samples. *** In agreement with the earlier DNA analysis, the victim's DNA was found on the condom. *** Preliminary probabilistic genotyping produced an unknown profile (not the victim or Morrow). This profile shows up in both the condom interior and exterior. Specifically the unknown profile is found in:

1. DNA from the interior epithelial fraction [and]

2. DNA from the exterior epithelial fraction[.]

The unknown is also weakly associated with the exterior sperm fraction of the condom. *** The unknown profile can be compared to reference profiles if you can obtain them from possible DNA contributors. It is my conclusion that any submitted reference samples would result in clear inclusion or exclusion using TrueAllele."

¶ 43    Defendant's response also included a March 2017 article from Prison Legal News, titled "Defense Attorneys Seek Access to DNA-Matching Software's Source Code," regarding the use of the TrueAllele software in criminal cases. Matthew Clarke, *Defense Attorneys Seek Access to DNA-Matching Software's Source Code*, Prison Legal News, Mar. 9, 2017, https://www.prisonlegalnews.org/news/2017/mar/9/defense-attorneys-seek-access-dna-matching-softwares-source-code/ [https://perma.cc/5VFZ-2CZT].

¶ 44    On December 5, 2019, the trial court issued an omnibus order disposing of defendant's requests then-pending before it, including defendant's September 14, 2018, and April 25, 2019,

motions for forensic testing as well as his October 3, 2018, motion for leave to file a successive postconviction petition. First, the trial court found "there is no basis to compel [Paschal] to give a DNA sample or to order a comparison of her already existing DNA to DNA potentially found on the condom" because "no testimony or evidence of any kind was introduced at trial that [Paschal] performed oral sex on the victim." Second, the trial court found defendant's argument that the lack of Siler's DNA from the outside of the condom would prove that Siler did not perform oral sex on the victim to be "speculative, unsupported by any documentation, and contra to other scientific evidence from trial." Third, the trial court found that issuing an order compelling a DNA sample from Siler would implicate the fourth amendment, and that none of the fourth amendment's due process requirements were met. In addition, the trial court noted that defendant's postconviction counsel had "over the years repeatedly advised [defendant] of our opinion on this matter, and explained that we could not, consistent with our ethical obligations, take a position that [Siler] should be compelled to produce [a DNA sample]." Finally, the trial court found that defendant had not made the showing of prejudice required to proceed on his successive postconviction petition alleging actual innocence.

¶ 45        Defendant filed a late notice of appeal, which this court granted.

¶ 46                                   ANALYSIS

¶ 47        On appeal, defendant raises two issues: (1) whether the circuit court erred in denying his request to compel Siler to submit a buccal swab for DNA testing, and (2) if it did err in that denial, whether it also erred in denying his request to compare any DNA sample from Siler thus collected against the unknown DNA profile obtained from the condom recovered from the victim. Although defendant does not challenge the trial court's denial of his October 3, 2018, motion for leave to file a successive petition, we note that, where a defendant sets forth

15

a claim of actual innocence in a successive postconviction petition, the defendant is excused from showing cause and prejudice. *People v. Ortiz*, 235 Ill. 2d 319, 331 (2009). Instead, "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *People v. Edwards*, 2012 IL 111711, ¶ 24.

¶ 48    Defendant argues first that the trial court had the authority to compel Siler to submit a buccal swab for forensic testing under section 116-3 and that, in light of this authority, the trial court erred in declining to compel her to do so. The State responds that the plain language of section 116-3 provides for forensic testing only on "evidence secured in relation to the trial" and does not permit a defendant to obtain additional forensic evidence for analysis after the trial has occurred.

¶ 49    We apply a *de novo* standard of review to a trial court's section 116-3 rulings and to questions of statutory interpretation. *People v. Gawlak*, 2019 IL 123182, ¶ 25. *De novo* consideration means we perform the same analysis that a trial judge would perform. *People v. Van Dyke*, 2020 IL App (1st) 191384, ¶ 41.

¶ 50    "In construing section 116-3 of the Code, we give the statutory language its plain and ordinary meaning." *People v. Shelton*, 351 Ill. App. 3d 292, 293 (2004); see also *People v. Leib*, 2022 IL 126645, ¶ 28 (statutory interpretation "begins with examining the plain and ordinary meaning of the statutory language, which is the surest and most reliable indicator of legislative intent"). We thus begin our analysis with the language of section 116-3(a), which provides in relevant part that:

"A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of *** forensic DNA testing, including

16

comparison analysis of genetic marker groupings[3] of the evidence collected by criminal justice agencies pursuant to the alleged offense, to those of the defendant, to those of other forensic evidence, and to those maintained under subsection (f) of Section 5-4-3 of the Unified Code of Corrections, on evidence that was secured in relation to the trial or guilty plea which resulted in his or her conviction ***." 725 ILCS 5/116-3(a) (West 2018).

¶ 51 To obtain the forensic testing requested, a defendant must make a *prima facie* showing that identity was at issue at his trial and "the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b) (West 2018). If a defendant makes this *prima facie* showing, the trial court must evaluate whether the requested testing is likely to produce new, noncumulative evidence that is materially relevant to the defendant's claim of actual innocence. *People v. Stoecker*, 2014 IL 115756, ¶ 26; see also 725 ILCS 5/116-3(c)(1)(i) (West 2018). The trial court must also determine whether the requested testing employs a generally accepted scientific method. 725 ILCS 5/116-3(c)(2) (West 2018).

¶ 52 At the outset, we reject the State's argument, made repeatedly throughout its appellate brief, that section 116-3 precludes a defendant from seeking forensic comparison analysis on any evidence that was obtained after a defendant's trial. Although the State is correct that section 116-3(a) provides for "forensic DNA testing *** on evidence secured in relation to the

---

[3]Section 116-3 does not define the term "genetic marker groupings." However, the commonly understood meaning of the term "genetic marker" is "[a] gene or short sequence of DNA used to identify a chromosome or to locate other genes on a genetic map." See Lexico, https://www.lexico.com/en/definition/genetic_marker (last visited Aug. 18, 2022) [https://perma.cc/Z6EC-GTNC]. Moreover, the terms "DNA profile," "genetic profile," and "genetic marker grouping analysis" are used interchangeably in the statutory provisions relating to Illinois's DNA database. It is thus "readily apparent that [section 116-3] encompasses both the biological and genetic statistical probability components of DNA profiling." *In re Jessica M.*, 399 Ill. App. 3d 730, 746-47 (2010).

17

trial *** which resulted in his *** conviction," the State's narrow reading ignores the clause of section 116-3(a) that affords the defendant the ability to request forensic DNA testing, "including comparison analysis of genetic marker groupings of the evidence collected by criminal justice agencies pursuant to the alleged offense, to those of the defendant, to those of *other forensic evidence*, and to those maintained under subsection (f) of Section 5-4-3 of the Unified Code of Corrections ***." (Emphasis added.) 725 ILCS 5/116-3(a) (West 2018). The legislature's inclusion of this clause would make little sense if limited in the way the State suggests. For example, if a defendant's DNA profile was collected pursuant to the alleged offense or in relation to the trial, the phrase expressly permitting comparison analysis to the DNA profile "of defendant" would be superfluous. Instead, this clause plainly permits a defendant to compare DNA evidence collected pursuant to the alleged offense against his own DNA profile, even if his DNA profile was not collected in connection with his prosecution, as the State consented to in the case at bar. In addition, the "genetic marker groupings maintained under subsection (f) of Section 5-4-3 of the Unified Code of Corrections" are those genetic profiles collected from individuals convicted of specific enumerated offenses and maintained in the ISP database. See 730 ILCS 5/5-4-3(f) (West 2020). The plain language of this clause permits comparison of genetic profiles collected pursuant to the alleged offense against all genetic profiles maintained in the ISP database, not only those maintained in the ISP database in connection with the defendant's trial—which, in many cases, would be only the defendant's genetic profile. It follows that the clause providing for "forensic DNA testing, including comparison analysis of genetic marker groupings of the evidence collected by criminal justice agencies pursuant to the alleged offense *** to those of other forensic evidence," which the legislature inserted in between the two foregoing clauses, is likewise unmodified by the

18

subsequent clause, "on evidence that was secured in relation to the trial." 725 ILCS 5/116-3(a) (West 2018).

¶ 53    In the case at bar, defendant seeks comparison analysis of DNA recovered from the condom, which was collected by the Chicago Police Department pursuant to the alleged offense and introduced at his trial, against "other forensic evidence," namely, a buccal swab collected from Siler. The plain language of section 116-3(a) would permit the defendant to obtain this forensic comparison, so long as he could satisfy the other requirements of the statute. See *People v. Rozo*, 2012 IL App (2d) 100308, ¶ 21 (ordering forensic comparison under section 116-3 of genetic material recovered from underneath the victim's fingernails with the DNA sample of an alternate suspect obtained by the defendant after trial through a private investigator). However, as noted, neither defendant nor the State presently possesses a DNA sample from Siler, and she has steadfastly refused to provide one. Accordingly, we return to the question of whether section 116-3 contains a mechanism to compel her to do so.

¶ 54    Defendant concedes that section 116-3 does not articulate grounds to compel a third party to provide a DNA sample. Indeed, the statute is altogether silent regarding discovery. "When a statute is silent on a particular point, we focus on the legislature's intent, and we will not interpret statutory silence in a way that defeats the purpose of that provision." *People v. Fiveash*, 2015 IL 117669, ¶ 34. Here, defendant argues that the intent of the legislature in enacting section 116-3 was to "give defendants who have maintained their innocence an opportunity to support their claims of innocence with forensic testing" and further maintains that defendant's request for Siler's DNA sample "fits squarely within that purpose." While we agree that "The clear purpose of section 116-3 was to provide convicted defendants with a means by which to establish actual innocence through advances in forensic technology"

19

(*People v. Urioste*, 316 Ill. App. 3d 307, 313 (2000)), we do not agree that compelling Siler to provide a buccal swab for DNA testing would comport with that purpose in the case at bar.

¶ 55    In effectuating the intent of the legislature, our courts have recognized that a trial court may allow limited discovery in section 116-3 proceedings in the appropriate case. See *People v. Travis*, 329 Ill. App. 3d 280, 285 (2002); *People v. Henderson*, 343 Ill. App. 3d 1108, 1116 (2003). However, such discovery has been limited to chain of custody issues, where the defendant lacked access to the information necessary to plead and prove section 116-3(b)'s chain of custody element because "the evidence at issue has been in the safekeeping of the State or the clerk of the circuit court." *Henderson*, 343 Ill. App. 3d at 1116. This court has identified no decisions in which our courts have countenanced the garnering of evidence possessed by a third party for forensic testing or comparison under section 116-3, and defendant has provided none. Contrary to defendant's position, "The statute does not provide a general means to discover evidence but rather an avenue to test targeted items that have the potential to provide materially relevant evidence as to a defendant's claim of actual innocence." *People v. Barrow*, 2011 IL App (3d) 100086, ¶ 30. Accordingly, we find no error in the trial court's refusal to compel the discovery of Siler's DNA sample under section 116-3.

¶ 56    Defendant next argues that even if section 116-3 does not itself provide an avenue to compel a third-party's DNA sample, trial courts have the inherent authority to compel discovery in postconviction proceedings and the trial court erred in declining to order such discovery here. See *People v. Johnson*, 205 Ill. 2d 381, 408 (2002) ("A trial court has inherent discretionary authority to order discovery in post-conviction proceedings."). Initially, we note that while proceedings on a section 116-3 motion may be characterized as "postconviction

20

proceedings," our supreme court has held that "a section 116-3 action is civil in nature and independent from any other type of collateral postconviction action." *Gawlak*, 2019 IL 123182, ¶ 32. We are therefore unpersuaded that the cases cited by defendant, in which courts ordered discovery at the second stage of postconviction proceedings under the Post-Conviction Hearing Act, support his request for discovery in the case at bar. See, *e.g.*, *People v. Jakes*, 2013 IL App (1st) 113057, ¶¶ 25-29 (permitting postconviction discovery at second stage); *People v. Fair*, 193 Ill. 2d 256, 264-65, 270 (2000) (trial court's denial of postconviction discovery at second stage was error where defendant showed "good cause"). In those cases, by virtue of their second stage posture, the trial court had already assessed the defendant's pleadings at the first stage and determined the defendant had set forth the "gist" of a constitutional violation or, in the case of a successive petition, established either (1) cause and prejudice for failing to raise his claim earlier or (2) a colorable claim of actual innocence. See 725 ILCS 5/122-1(a), (f) (West 2018). In the case at bar, the trial court made no such finding of preliminary merit.

¶ 57    However, assuming that a trial court's inherent authority to conduct postconviction discovery extends to proceedings on a motion for leave to file a successive petition alleging actual innocence like the one the trial court considered here, such discovery is still authorized only upon a showing of "good cause." *Fair*, 193 Ill. 2d at 264-65 (discussing "good cause" standard); *People v. Howery*, 2019 IL App (3d) 160603, ¶ 19 ("it is clear that postconviction discovery is allowed while a postconviction petition remains pending"). In determining whether a defendant has shown "good cause," a trial court should consider the "totality of the relevant circumstances," including "the issues presented in the petition, the scope of the discovery sought, the length of time between the conviction and the postconviction proceeding, the burden [of discovery on the State and on any witnesses,] and the availability of the desired

21

evidence through other sources." (Internal quotation marks omitted.) *Jakes*, 2013 IL App (1st) 113057, ¶ 25. We review a trial court's denial of a request for postconviction discovery for abuse of discretion. *Fair*, 193 Ill. 2d at 265. A trial court abuses its discretion only where its "decision is arbitrary, fanciful or unreasonable or where no reasonable [person] would take the view adopted by the court." (Internal quotation marks omitted.) *People v. Shum*, 207 Ill. 2d 47, 62 (2003).

¶ 58     In the case at bar, while we recognize that Siler's DNA sample is unavailable through other sources and that defendant's request is narrow in scope, we find the other "good cause" factors weigh against compelling Siler to provide a DNA sample and accordingly find no abuse of discretion in the trial court's denial of defendant's request. We address these remaining factors in turn.

¶ 59     First, defendant's petition presents the issue of his actual innocence. A claim of actual innocence requires that the supporting evidence be "new, material, noncumulative and, most importantly, of such conclusive character as would probably change the result on retrial." (Internal quotation marks omitted.) *People v. Hickey*, 204 Ill. 2d 585, 601-02 (2001). Here, we agree with the trial court's finding that even if Siler's DNA would be a nonmatch to the DNA recovered from the condom, that result would not produce evidence of such conclusive character as would probably change the result on retrial. Instead, a nonmatch would merely corroborate what Siler already told the jury—that she did not perform oral sex on the victim on the night of his death. See *People v. Brown*, 2013 IL App (1st) 091009, ¶ 54 (DNA evidence insufficient to warrant postconviction relief where it did not undermine witnesses' trial testimony). In addition, to the extent a nonmatch would bolster Siler's impeached trial

22

testimony on this collateral issue, it would do so only marginally, at best, when considered alongside the other forensic evidence presented at trial.

¶ 60    Specifically, as the trial court explained, the victim's fingerprints were not found on the steering wheel of the vehicle, even though his left hand was on the steering wheel at the time his body was discovered. His palmprints were not found on the outside of his vehicle, though it was undisputed that the vehicle was his and his body was found inside the vehicle. In addition, the victim's fingerprints were not found on any cards or papers that were in the wallet identified at trial as being his wallet, yet there was no dispute that the wallet was his. Against this evidence, it is speculative to suggest that a nonmatch between Siler's DNA and the unknown DNA on the condom would lead a jury to conclude that she did not perform oral sex on the victim, much less make the further inference that defendant did not commit the murder. While this court is aware that, especially given advances in forensic technology, a person may be more likely to deposit recoverable trace DNA than identifiable fingerprints, it remains the case that a nonmatch between Siler's DNA profile and the unknown profile on the condom would not conclusively establish Siler's lack of presence at the scene or that her prior statements and grand jury testimony were false. The conclusive nature of the requested evidence is further limited by the fact that two of the three forensics labs that recently analyzed the condom were unable to identify any unknown profiles at all.

¶ 61    To be clear, we agree with defendant's assertion that testing under section 116-3 "is not limited to situations in which scientific testing of a certain piece of evidence would completely exonerate a defendant" (*People v. Savory*, 197 Ill. 2d 203, 214 (2001)) and that a motion for forensic testing should be granted where such testing holds out even the " 'slight' " possibility for a favorable result (*People v. Price*, 345 Ill. App. 3d 129, 134 (2003) (quoting *Anderson v.*

23

*State*, 831 A.2d 858, 867 (Del. 2003))). Here, we find only that to support the finding of "good cause" required to compel postconviction discovery from an unwilling third party like Siler, a defendant must show something more than the "slight" probability that the evidence sought will support his claim.

¶ 62    Second, and most importantly to the case at bar, the burden of compelling Siler to submit a buccal swab against her will is clearly substantial. This burden is in fact so significant that the trial court found that compelling such discovery without probable cause for Siler's arrest would violate the due process requirements of the fourth amendment. Defendant responds that, contrary to the trial court's finding, his request does not raise fourth amendment concerns because he seeks Siler's DNA sample in his capacity as a private citizen. However, we need not decide this constitutional issue here, because even applying the lower standard urged by defendant, he has not shown he is entitled to discovery of Siler's DNA sample.

¶ 63    On this point, in apparent recognition of the significant burden of compelling an unwilling witness to provide a DNA sample, and in light of the fact that Illinois courts have not articulated standards against which a trial court may compel such intrusive discovery, defendant urges this court to take guidance from other sources. Specifically, defendant maintains that he has satisfied the criteria set forth in the American Bar Association's (ABA) Standards for Criminal Justice: DNA Evidence. These standards provide in relevant part that a judicial order for DNA evidence from a person not suspected of a crime may issue "upon notice and after an opportunity for a hearing at which the person has a right to counsel" if there is "probable cause that a serious crime has been committed" and

> "a sample is necessary to establish or eliminate that person as a contributor to or source of the DNA evidence or otherwise establishes the profile of a person who may have

24

committed the crime, either because there is reason to believe that the person has contributed to or been the source of the DNA evidence, or for other good cause shown that the sample of that particular person is necessary for that purpose." ABA Standards for Criminal Justice: DNA Evidence, Standard 16-2.2(b) (3d ed. 2007), https://www.americanbar.org/content/dam/aba/publications/ criminal_justice_standards/dna_evidence.pdf [https://perma.cc/6M72-FWEZ].

As the plain language of this standard suggests, and as the commentary to this standard clarifies, "necessity" for the non-suspect's DNA sample is the prevailing consideration. See ABA Standards for Criminal Justice: DNA Evidence, Commentary to Standard 16-2.2(b)(ii) (3d ed. 2007) ("[N]on-suspects have the same Fourth Amendments rights as suspects but reasonable suspicion is not required for non-suspects, since there can be, by definition, no reason to suspect such a person. Instead, the Standard requires 'necessity' for the sample.").

¶ 64    Applying this standard to the case at bar, defendant argues that "Siler's sample is necessary to either establish or eliminate her as the contributor to the unknown profile on the condom, as that will tend to confirm either her grand jury or trial testimony." We find no abuse of discretion in the trial court's contrary finding. As previously explained, the trial court rejected the notion that a nonmatch between Siler's DNA sample and the unknown DNA sample recovered from the condom could confirm Siler's impeached trial testimony or undermine her grand jury testimony, and therefore found a resounding lack of necessity for her DNA sample. Moreover, requiring the trial court to conduct a hearing at which Siler would be appointed counsel consistent with the foregoing ABA standards significantly increases the burden of this discovery on both Siler, as an unwilling witness, and the State, further militating against a finding of "good cause." *Cf. People v. Williams*, 209 Ill. 2d 227, 238 (2004) (finding no abuse

25

of discretion in trial court's denial of postconviction discovery, where jurors had expressed their "unwillingness to discuss the details of their jury service," and therefore, "[f]urther contact with these individuals would have been intrusive and unjustified").

¶ 65    Defendant's own cited authority supports the conclusion that the trial court did not abuse its discretion in refusing to compel Siler's DNA sample against her will, where that sample would serve the limited purpose of potentially corroborating elements of her trial testimony. In *In re Jansen*, 826 N.E.2d 186, 190, 192 (Mass. 2005), *abrogated by Commonwealth v. Dwyer*, 859 N.E.2d 400 (Mass. 2006), the Supreme Judicial Court of Massachusetts found that a third party could be compelled to submit a buccal swab for DNA testing in advance of trial where the third party's DNA had "significant relevance and evidentiary value" to the defense. There, while awaiting trial, defendant used a private investigator to obtain a third party's DNA and retained an expert to compare the third party's DNA sample to an unknown DNA profile recovered from a barrette that was inserted into the victim during the alleged aggravated assault for which defendant was on trial. *Jansen*, 826 N.E.2d at 189. The results indicated that the unknown DNA profile from inside the victim matched the third party's DNA profile, and, defendant argued, established a nonmatch to defendant's DNA profile. *Jansen*, 826 N.E.2d at 192. The trial court compelled the third party's DNA sample in order to alleviate any chain of custody concerns caused by the involvement of the private investigator. *Jansen*, 826 N.E.2d at 192. In affirming the trial court's order to compel an additional DNA sample from the third party, the court emphasized that "the exculpatory value of this factual showing cannot be minimized or deemed inconsequential," and was instead "critical to the preparation of [defendant's] defense against charges of aggravated rape." *Jansen*, 826 N.E.2d at 192. Here, by contrast, there has been no preliminary showing that Siler's DNA sample will provide a

26

nonmatch to the unknown profile on the condom, and the trial court found defendant's contrary assertion to be speculative. Moreover, whether Siler's DNA is present on the condom is not directly relevant to the crime of murder for which defendant was convicted, and the evidence sought therefore has comparatively minimal exculpatory value.

¶ 66      In *Randolph v. Commonwealth*, 173 N.E.3d 317 (Mass. 2021), the Supreme Judicial Court of Massachusetts upheld the trial court's order compelling a third party to provide a DNA sample during postconviction proceedings, where the third party in question was a viable alternative suspect for the offense. There, the evidence to be tested was obtained from a knife used in a brawl that precipitated the murder for which defendant was convicted and preliminary postconviction testing excluded the defendant as having contributed to the DNA mixture recovered. *Randolph*, 173 N.E.3d at 327-28. In the defendant's motion for a new trial, he introduced statements from witnesses claiming that the third party had admitted to committing the crime, which corroborated trial testimony from a witness who testified that she observed the knife in the air, observed it strike the victim, and then immediately looked up and observed only the third party. *Randolph*, 173 N.E.3d at 327. Based on the foregoing, the court found that "a result matching [the third party's] DNA to that located on the knife would make it more probable that he threw the knife at the victim." *Randolph*, 173 N.E.3d at 328. The *Randolph* court explicitly distinguished situations, like the situation before us, in which there is only a tenuous connection between the material to be tested and the perpetrator of the crime. *Randolph*, 173 N.E.3d at 327. Here, a nonmatch between the unknown profile and Siler's DNA sample would not aid in the identification of the perpetrator of the offense or establish that the perpetrator was not the defendant.

¶ 67 Finally, defendant acknowledges that a significant amount of time has elapsed between defendant's 1996 conviction for murder and his current request to compel Siler's DNA sample. As to this factor, we agree with the trial court that it would have been premature to seek Siler's DNA sample prior to the recovery of an unknown DNA profile from the condom against which to compare it—which did not occur until Cybergenetics' independent analysis of the material on the condom in 2018. Accordingly, this factor does not weigh against a finding of "good cause." Nevertheless, we find the trial court did not abuse its discretion in consideration of the totality of the circumstances, which do not warrant compelling Siler to submit a DNA sample against her will for forensic analysis or comparison.

¶ 68 Finding no abuse of discretion in that regard, we find no error in the trial court's denial of defendant's requests for further forensic testing under section 116-3.

¶ 69                                    CONCLUSION

¶ 70 For the foregoing reasons, we affirm the judgment of the trial court.

¶ 71 Affirmed.

*People v. Morrow*, 2022 IL App (1st) 200388

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 94-CR-26967(03); the Hon. Angela Munari Petrone, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Erica Margaret Mail, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Tasha-Marie Kelly, and Sara McGann, Assistant State's Attorneys, of counsel), for the People. |